HENRY GERNER v. CHARLES W. MOSHER ET AL.                58   135
                                                        s61  101

FILED FEBRUARY 23, 1899.   No. 8707.

1. **Jurisdiction: REMOVAL OF CAUSE: RES JUDICATA.** Where a cause has been removed from a state court to the federal court and has been by that court remanded to the state court for want of jurisdiction, it is the duty of the state court, in subsequent proceedings, to treat as conclusive upon it the decision of the federal court on the question of jurisdiction.

2. **Stockholders: RIGHT TO INSPECT BOOKS.** Assuming it to be the right of a stockholder in a corporation to examine the books thereof, it is not, as a matter of law, his duty to do so, after becoming a stockholder, for the purpose of ascertaining whether or not he has been defrauded in the purchase of such stock, he not being aware of any fact leading to a suspicion that he may have been so defrauded.

3. **National Banks: REPORTS: PUBLICATION.** The object of requiring publication by national banks of reports made to the comptroller of the currency in pursuance of section 5211, Revised Statutes U. S., is to afford information to all persons having or contemplating business transactions into which the condition of the bank directly enters as a material factor.

4. ———: ———. Therefore, one contemplating the purchase of stock in the bank is entitled to rely on such publications equally with a depositor or note-holder.

Gerner v. Mosher.

5. ———: ———: ATTESTATION. The statute referred to requires such report to be verified by the oath or affirmation of the president or cashier and to be attested by the signature of at least three directors. To charge a director individually with the consequences of false reports it must appear that he attested them, or that he in some manner participated in making or publishing them. The attestation is not the act of the whole board, but that of the individual directors signing it.

6. False Representations. One who makes a false representation under circumstances which would render him liable if it were made voluntarily is not excused by the fact that the law required him to make a true statement of the character counted upon.

7. National Banks: FALSE REPORTS: OFFICER. The president and cashier of a bank, shown to have personally conducted its business, cannot be presumed ignorant of the falsity of reports of the bank's condition by them published, the books of the bank on their face disclosing the falsity.

8. ———: ———: STATUTES. The word "attest," as used in section 5211, Revised Statutes U. S., means something more than to witness the execution of the report by the president or cashier. It means to certify its correctness.

9. ———: ———: EFFECT OF ATTESTATION. Where the directors of a national bank attest the reports made of its condition by its executive officers to the comptroller of the currency under section 5211, Revised Statutes U. S., they thereby certify that the statements contained in said report are absolutely true. IRVINE and RYAN, CC., dissenting.

10. False Representations. In an action for false representations it is not necessary to aver or prove that the party making them knew they were untrue. And this rule is applicable to an action for deceit against the director of a bank for falsely stating the financial condition of the corporation. IRVINE and RYAN, CC., dissenting.

11. National Banks: FALSE REPORTS: LIABILITY OF DIRECTORS. The directors of an insolvent national bank are personally liable, at the suit of one purchasing the stock of such bank, for damages sustained by the reason of the insolvency of the corporation, when the plaintiff is induced to make such purchase by false representations of solvency, contained in reports made by the bank to the comptroller of the currency and attested by the directors and published in pursuance of law, even though the directors were unaware that such reports and representations were false or untrue and were made without intention to defraud. IRVINE and RYAN, CC., dissenting.

ERROR from the district court of Lancaster county. Tried below before HALL, J. *Reversed in part.*

*Joseph R. Webster, Halleck F. Rose,* and *Cyrus W. Fisherdick,* for plaintiff in error:

The official report is a p⁻blic representation, and plaintiff had a right to rely on it. (*Bartholomew v. Bentley,* 15 O. 666; *Merchants Nat. Bank v. Thoms,* 28 W. L. B. [O.] 164; *Morse v. Swits,* 19 How. Pr. [N. Y.] 275; *Prescott v. Haughey,* 65 Fed. Rep. 659; *Delano v. Case,* 121 Ill. 247; *Scale v. Baker,* 70 Tex. 283; *Salmon v. Richardson,* 30 Conn. 360; *Tate v. Bates,* 118 N. Car. 287; *Prewitt v. Trimble,* 92 Ky. 181; *Bedford v. Bagshaw,* 4 Hurl. & N. [Eng.] *548; *Solomon v. Bates,* 24 S. E. Rep. [N. Car.] 478; *Morgan v. Skiddy,* 62 N. Y. 325; *Kinkler v. Junica,* 84 Tex. 116; *United States v. Allis,* 73 Fed. Rep. 169; *National Exchange Bank v. Sibley,* 71 Ga. 726; *Upton v. Vail,* 6 Johns. [N. Y.] *182; *Barney v. Dewey,* 13 Johns. [N. Y.] 224; *Allen v. Addington,* 7 Wend. [N. Y.] 22; *Williams v. Wood,* 14 Wend. [N. Y.] 126.)

The right to maintain the action against national bank directors is clearly and distinctly given by section 5239, Revised Statutes U. S. (*Welles v. Graves,* 41 Fed. Rep. 459; *Hayden v. Thompson,* 67 Fed. Rep. 273; Potter Dwarris, Statutes & Constitutions 275, note 5; *Lowry v. Chicago, B. & Q. R. Co.,* 46 Fed. Rep. 83; 3 Thompson, Corporations sec. 4113; *Stephens v. Overstolz,* 43 Fed. Rep. 771.)

As to the character of proof required to establish knowledge on the part of directors of the financial condition of a bank, see: *Merchants Bank v. Rudolf,* 5 Neb. 540; *United States v. Allis,* 73 Fed. Rep. 165; *Allis v. United States,* 155 U. S. 117; *Finn v. Brown,* 142 U. S. 71; *United Society of Shakers v. Underwood,* 9 Bush [Ky.] 609; *Hauser v. Tate,* 85 N. Car. 84; *German Savings Bank v. Walfekuhler,* 19 Kan. 60; *Hubbard v. Weare,* 79 Ia. 678.

A stockholder in a bank, by virtue merely of that relation, is not chargeable with notice of its financial condition. (*Hardy v. Veasey,* 3 L. R. Ex. [Eng.] 107; *Foster v. Bank of London,* 3 F. & F. [Eng.] 214; *Commonwealth v. Phœnix Iron Co.,* 105 Pa. St. 111; 4 Thompson, Corporations sec. 4428; *Foley v. Holtry,* 43 Neb. 133.)

*Charles O. Whedon* and *J. W. Deweese, contra.*

References: *Brackett v. Griswold,* 112 N. Y. 454, 467; *Honnewell v. Duxbury,* 154 Mass. 286; *Arthur v. Griswold,* 55 N. Y. 400; *Wakeman v. Dalley,* 51 N. Y. 27; *Kountze v. Kennedy,* 147 N. Y. 124; *Nash v. Minnesota Title Ins. & Trust Co.,* 163 Mass. 574; *Pier v. Hanmore,* 86 N. Y. 95; *Bonnell v. Griswold,* 89 N. Y. 122; *Stebbins v. Edmands,* 12 Gray [Mass.] 203; *Peek v. Gurney,* 7 Eng. Ruling Cas. 527; *Derry v. Peek,* 14 Appeal Cas. [Eng.] 337; *Crocker v. Manley,* 164 Ill. 282; *Southern Development Co. v. Silva,* 125 U. S. 247; *Runge v. Brown,* 23 Neb. 817; *Byard v. Holmes,* 34 N. J. Law 296; *Humphrey v. Merriam,* 32 Minn. 197; *Lord v. Goddard,* 13 How. [U. S.] 198; *Wells v. Cook,* 16 O. St. 67; *McCracken v. West,* 17 O. 16; *Caldwell v. Bates,* 24 S. E. Rep. [N. Car.] 481; *Nudd v. Hamblin,* 8 Allen [Mass.] 130; *Wood v. Carpenter,* 101 U. S. 135; *Hecht v. Slaney,* 72 Cal. 367; *Jesup v. Illinois C. R. Co.,* 43 Fed. Rep. 503; *Parker v. Kuhn,* 21 Neb. 413; *Wright v. Davis,* 28 Neb. 479; *Gillespie v. Cooper,* 36 Neb. 775; *State v. Boyd,* 49 Neb. 311; *Rugan v. Sabin,* 3 U. S. C. C. A. 578; *Stearns v. Page,* 7 How. [U. S.] 819; *Moore v. Greene,* 19 How. [U. S.] 69; *Beaubien v. Beaubien,* 23 How. [U. S.] 190; *Badger v. Badger,* 2 Wall. [U. S.] 95; *Lorenzen v. Kansas City Investment Co.,* 44 Neb. 99; *Slayton v. Fremont, E. & M. V. R. Co.,* 40 Neb. 840; *Dehning v. Detroit Bridge & Iron Works,* 46 Neb. 556; *Briggs v. Spaulding,* 141 U. S. 132.

*F. M. Hall,* also for defendants in error.

IRVINE, C.

Henry Gerner brought this case against Charles W. Mosher, Richard C. Outcalt, Charles E. Yates, David E. Thompson, Rollo O. Phillips, Ambrose P. S. Stuart, and Ellis P. Hamer. Homan J. Walsh and Emma H. Holmes, the latter as administratrix of the estate of William W. Holmes, were also named as parties defendant, but as

to them the proceedings seem to have been abandoned. The petition alleges that Mosher was the president of the Capital National Bank, Walsh its vice-president, and Outcalt its cashier, and that the other defendants named, together with Mosher, constituted its board of directors. The petition is in two counts, the first alleging that on May 18, 1887, a report was made by the defendants, to the comptroller of the currency, of the resources and liabilities of said bank as they existed May 13, 1887; that said report was sworn to by Outcalt as cashier and attested as correct by Mosher, Holmes, and Yates as directors; that the defendants caused said report to be published in the *State Journal*, a newspaper published in Lincoln, "for the purpose of inducing others, and particularly this plaintiff, to deal with said corporation and to repose in it and them, its directors and managing officers, and to induce others, and particularly this plaintiff, to purchase its capital stock and make investments therein, and represented and held out said statement to be a true statement of the financial condition of said corporation." The report is then set out in terms, and it is alleged that said report was false, in that it overstated the mortgages, stocks, and bonds held by the bank to the amount of $30,000, the amount due the bank from reserve agents, about $76,000, and its loans and discounts $50,000; that said report and false representations were made by said four defendants with the knowledge, assent, and co-operation of all the other defendants, and the same were, as they and each of them well knew, wholly false and untrue; that plaintiff believed said representations to be true, and on the faith thereof purchased from Charles Hammond on July 11, 1887, fifty shares of the capital stock of said corporation for the sum of $6,250; that it would have been worth said sum had the said report been correct, but in fact the bank was insolvent and the stock worthless; that January 22, 1893, the bank failed; that the stockholders have been assessed one hundred cents on the dollar on their stock, and judgment

rendered against the plaintiff for said assessment; that notwithstanding that the bank had no net earnings, dividends were from time to time declared, and suit has been brought against the plaintiff to recover dividends by him received. The second cause of action is, substantially, pleaded in the same manner, charging a false report of the condition of the bank September 30, 1889, and the purchase by the plaintiff, in reliance on that report, in November, 1889, of fifty shares of stock from Henry E. Lewis for the price of $7,250. The defendants filed separate answers, denying the material averments of the petition, pleading the statute of limitations, and also pleading that the action was one whereof the federal courts had exclusive jurisdiction, and that it had been removed to the circuit court for the district of Nebraska. At the close of the trial the district judge peremptorily instructed the jury to return a verdict for all the defendants. The plaintiff brings the case here for review.

The plaintiff contends that he was entitled to relief under the provisions of section 5239 of the Revised Statutes U. S. relating to the liability of directors of national banks. It, however, partly appears from the record, and is stated in both of the briefs, that the action was at one time removed to the federal court; that a motion to remand was overruled, but that subsequently, the case arising in that court, Judge Shiras presiding, on a demurrer to the petition it was found that the federal court had no jurisdiction and the case was therefore remanded to the district court of Lancaster county. The opinion of Judge Shiras, remanding the case, is found in *Gerner v. Thompson*, 74 Fed. Rep. 125, and proceeds on the ground that an action under section 5239 of the Revised Statutes may be maintained only by the receiver of the bank, so that an action by a private individual against directors for making false reports must be maintained, if at all, as an action at the common law for deceit, and therefore presents no question under the laws of the United States. Judge Shiras also expresses his opinion to the

effect that in order to maintain an action under the federal statute it must appear that a forfeiture of the bank's charter has been adjudged at the suit of the comptroller of the currency. Plaintiff vigorously attacks this opinion, especially the latter part. But under the circumstances we would not be free, if we were so disposed, to give the statute a construction different from that which was given it by the federal court in this very case. The construction of the statute was necessary for the purpose of the demurrer, and as leading to the order remanding the case, and it being a federal statute, construed by a federal court in determining its own jurisdiction, we are bound to accept the result of that construction, and are not at liberty to here review it. (*Missouri P. R. Co. v. Fitzgerald,* 16 Sup. Ct. Rep. 389.)

The defendants, to sustain the action of the trial court, contend that the action was barred by the statute of limitations, the first cause of action arising in 1887, the second in 1889, and the suit not having been brought until 1894. It is evident that if the action may be maintained at this late date it must be by virtue of section 12 of the Code of Civil Procedure, providing that actions may be brought "Within four years, * * * an action for relief on the ground of fraud, but the cause of action in such case shall not [be] deemed to have accrued until the discovery of the fraud." In order to bring the case within the exception of this statute, the plaintiff pleads "that defendants continued after said 18th day of May, 1887, to be directors and managing officers of said corporation, and contrived by repeated false statements of the resources and liabilities of said corporation, all of which were published and came to the notice of the plaintiff at the time of their being made and published, or shortly thereafter, and were by him believed to be true and relied upon, and by fraudulently declaring unauthorized dividends on its capital stock that the corporate business might falsely appear to be profitable, to conceal from the plaintiff the condition of said corporation and the

falsity of said representations; and said defendants
fraudulently, knowingly, and willfully so concealed its
condition that plaintiff did not discover said reports and
representations to be false until on or about the 1st day
of April, 1894." The evidence quite clearly shows that
the plaintiff did not in fact know of the real condition
of the bank until about the time of its failure. It also
appears that reports were from time to time published
of the condition of the bank, down to about the time of
its failure, and that such reports were all false. It ap-
pears also that dividends were declared from time to time
until shortly before the failure. It affirmatively appears,
however, that none of the defendants save Mosher and
Outcalt actually knew of the condition of the bank or the
falsity of the reports, and that there was no actual in-
tent on the part of such other defendants to mislead the
plaintiff. We do not think that under this evidence the
district court would have been justified in instructing
for the defendants on the plea of limitations, and in fact
the peremptory instruction was not based upon that
ground.

It is contended by the defendants that the plaintiff, on
becoming a stockholder, obtained the right of access to
the books and that even a cursory examination of the
books would have disclosed the falsity of the reports;
that he must, therefore, be held, on account of such means
of knowledge, to have actually discovered the fraud at
or about the time when he bought the stock. Assuming
that a stockholder has an unlimited right to examine the
books of the bank, still we cannot adopt the theory that
the plaintiff, immediately on purchasing the stock, was
under any legal obligation to make such examination for
the purpose of ascertaining whether he had been de-
frauded in the purchase. It is true that in this state
rather a strict construction has been placed upon this
section of the statute of limitations, and it is here the
law that the statute begins to run, not only from the
actual discovery of the fraud, but from the time of the

discovery of such facts as would put a person of ordinary intelligence and prudence on inquiry which, if pursued, would lead to such discovery. (*Parker v. Kuhn*, 21 Neb. 413; *Wright v. Davis*, 28 Neb. 479; *Gillespie v. Cooper*, 36 Neb. 775; *State v. Boyd*, 49 Neb. 303.) In *Gillespie v. Cooper* it was also said that the party defrauded must be diligent in making inquiry; that means of knowledge are equivalent to knowledge. But it was stated in the same connection that a clue to the facts, which if followed up diligently would lead to a discovery, is in law equivalent to a discovery. None of the cases holds, nor are we aware of any case elsewhere which holds, that a man must be so keenly on the scent of efforts to defraud him that, without knowledge of any fact which would lead a prudent man to suspect that he had been defrauded, he is bound to make investigations which he is not obliged to make for other purposes, merely because it is in his power to make such investigations. There was some proof introduced and some tendered tending to show that Mr. Gerner, considering that he was a stockholder only and not a director, took quite a keen interest in the affairs of this bank, and was somewhat active concerning the same. But giving such evidence its utmost effect, it could have been no more than a question for the jury whether or not he thereby became apprised of any fact which imposed upon him the active duty of resort to an examination of the books. Certainly, in the absence of all grounds of suspicion, he cannot be held, as a matter of law, to have been compelled to make such examination. To hold stockholders to such a degree of diligence would in the case of many corporations cause the real business of the corporation to be seriously impeded by the invasion of stockholders for such purposes, and in the case of banks would seriously impair the right of secrecy which customers possess as to the state of their accounts.

Before entering upon the more difficult questions relating to the merits of the case it will be convenient at

this time to dispose thereof so far as concerns the defendants Thompson, Phillips, Stuart, and Hamer. None of these defendants signed either of the reports which the plaintiff claims misled him. In order to charge them the plaintiff alleged that the reports were made with the knowledge, assent, and co-operation of the defendants last named, and were, as each of them knew, false and untrue. The nature of the evidence on this point is accurately stated in the instruction of the trial court, as follows: "Plaintiff has failed in his evidence to produce a particle of testimony even tending to show that either Thompson, Hamer, Phillips, or Stuart knew, assented, or co-operated in the making or publishing of the said reports; and there is no attempt in the evidence on the part of the plaintiff to contradict the testimony given by each one of them touching their having no connection with the said reports on which plaintiff grounds his cause of action for deceit. The evidence utterly fails to show that either Thompson, Hamer, Phillips, or Stuart was guilty of any dishonest or fraudulent conduct in the making and publishing of said reports, or either of them." The plaintiff seeks to avoid the effect of failure of proof in this respect by the argument that the four directors not joining in the reports were bound as directors to know the condition of the bank, and conclusively presumed, therefore, to know the falsity of the reports, and that the reports being a corporate act, are their act as well as that of those actively participating.

We shall hereafter have occasion to discuss the duties of directors of national banks, but such discussion is not immediately pertinent to the question before us. The reports relied on as constituting the false representations were made by virtue of section 5211 of the Revised Statutes of the United States, requiring reports to be made to the comptroller of the currency "verified by the oath or affirmation of the president or cashier of such association, and attested by the signature of at least three of the directors." The statute further requires their publica-

tion.   While in a technical sense, the report being re-
quired of the association, it is a corporate act, neverthe-
less it is not such a corporate act as is or must be
performed by the directors acting as a board.   Nor are
all the directors required to therein participate.   It is
not necessary that the president and cashier should both.
take part.   The report may be verified by either of these
officers, and it is sufficient if it be attested by the signa-
tures of three of the directors.   The language clearly
shows that in attesting such directors act as individual
directors and not as a board.   Being a corporate act, a
report made by the designated officers would probably
bind the corporation.   In *Prescott v. Haughey*, 65 Fed.
Rep. 653, it was said that false representations in such a
report, if made under color of office, were entirely out-
side of the official duties of the directors; that neither
the law nor the obligations of their office made it any
part of their duty to utter and publish false and fraudu-
lent advertisements and reports.   It follows from this,
if it were not true independently thereof, that a director
cannot be held liable because he did not join in such an
*ultra vires* act. · The corporation may be bound by the
act of its constituted officers, but when it is sought to
charge officers individually for *ultra vires* acts or for mis-
conduct it is only those who participate therein who are
liable, in the absence, of course, of conspiracy or indirect
participation, which was here not only unproved, but was
affirmatively    disproved.    As    to    Thompson,    Stuart,
Phillips, and Hamer, it follows that the judgment must
be affirmed.

   The peremptory instruction of the district court as to
the remaining defendants proceeded on the ground that
the reports relied on as constituting the false representa-
tions were made for the information of the comptroller
of the currency and published for the information of
those dealing with the corporation itself, and that they
constituted no representation to other classes of per-
sons—as to one contemplating an investment in the stock

of the corporation; that, therefore, Gerner had no right to rely on the statements. We do not think that this position is sound. It certainly is not true, as contended by the defendants, that the sole object of the report is the information of the comptroller of the currency, because that object would be fully satisfied with the requirement that the report should be transmitted to him. In addition to this, a newspaper publication is required by the statute, and the corporation is required to furnish to the comptroller proof of such publication. As seen, publication is not necessary for the information of the comptroller, and it certainly is not required for the mere amusement of the public. We think the object is to afford public information to all persons having or contemplating business transactions into which the condition of the bank enters as a material factor. *Merchants Nat. Bank of Hillsboro v. Thoms*, 28 W. L. B. [O.] 164, while not the decision of a court of last resort, is enforced by so clear and so able an opinion that it logically carries more weight than many decisions of higher courts. It was there held that the purpose of requiring publication was of the general character we have indicated; and that one who was induced to lend money to a stockholder on the security of stock in the bank had his remedy against the officers fraudulently making the false reports. In *Graves v. Lebanon Nat. Bank*, 10 Bush [Ky.] 23, it was held that persons who were induced to become sureties on the bond of a cashier in reliance on such a report, which by its falsity concealed the cashier's past dishonesty, were by reason thereof discharged from liability. In *Prewitt v. Trimble*, 92 Ky. 176, a purchaser of stock was held entitled to a rescission of the contract, the vendor of the stock in that case being an officer who joined in the report. In *Tate v. Bates*, 24 S. E. Rep. [N. Car.] 482, a depositor was held entitled to relief. Such also was the case in *Scale v. Baker*, 70 Tex. 283. *Morse v. Switz*, 19 How. [N. Y.] 275, is another case where the purchaser of stock was held entitled to relief for fraud in

the published reports.   The last case is criticised by the
defendants because it cites *Bedford v. Bagshaw*, 4 H. &
N. [Eng.] 537, and that case was overruled by the house
of lords in *Peek v. Gurney*, 6 L. R. H. L. [Eng.] 377.   The
reasoning in *Morse v. Switz* proceeds, however, on inde-
pendent grounds, and *Bedford v. Bagshaw* went much
further than any of the cases we have cited.   In that
case the listing of stock on the stock exchange was
treated as a public representation that the stock was not
less than two-thirds paid, the rules of the stock exchange
requiring such payment as a condition of listing; while
the case overruling it was to the effect that a prospectus
of an intended company is for the purpose of inviting
persons to become allottees of shares, and that, having
served that purpose, its function is exhausted, and it may
not be relied on by the purchaser of shares after the or-
ganization of the company.   It will be seen that the two
English cases are both entirely aside from any question
now before us.   In none of the cases has the court held
that only those dealing directly with the bank as deposi-
tors or holders of its circulating notes are entitled to the
information given by the report.   While that doctrine
has been argued in other cases, as in this, we cannot find
that it has ever been sustained; and we have no doubt
that the object of congress in requiring publication was
as broad as we have above stated it.   That being the
object of the law, such reports become a public repre-
sentation to all classes of persons falling within that
object.   This discussion argumentatively disposes of the
further contention of the defendants that they are not
liable because the publication was not voluntary, but
was one required by law.   We know of no rule of law
which, holding men responsible for voluntary statements,
excuses them for misrepresentations in statements which
the law requires them to make for the very purpose that
they may be relied on.   .   .

At this point the cases of Mosher and Outcalt diverge
from that of Yates.   As already stated, Mosher was the

president of the bank and Outcalt its cashier. The proof shows that the affairs of the bank were largely conducted by Mosher without particular supervision by other officers. There is also some proof of direct falsification of the bank's records by Mosher himself. Outcalt verified the reports. It can hardly be that the president and cashier of a bank, actively controlling and managing its business, can be excused for gross ignorance of the bank's condition. Moreover, the falsifications here complained of were not in the books of the bank, but in making up the report from those books, there being most glaring differences between the daily balance book of the bank, showing at a glance its condition on the days to which the reports related, and the reports themselves. Very clearly, if Gerner had a right to rely on the reports, there was sufficient evidence, at least to go to the jury, for the purpose of charging Mosher and Outcalt, and the judgment as to them must be reversed.

The directors attesting the reports were Mosher, Holmes, and Yates. Holmes died before the action was begun, and, as already stated, the case seems to have been abandoned as to his administratrix. Yates was merely a director. He was not otherwise an officer or employé of the bank, and his liability, if any exists, depends upon his action as a director alone. It therefore becomes necessary to consider what was meant by the use of the word "attest" in section 5211 of the Revised Statutes, requiring reports to be attested by the signature of at least three of the directors. It will be observed that the word "attest" could not have been there used merely in the sense of witnessing the signature of the president or cashier. The language is not that such signature shall be attested, but that the report shall be verified by the oath or affirmation of the president or cashier, and attested by the signature of at least three of the directors. It is the report itself and not the act of the president or cashier which is so attested. Furthermore, in the following section national banks are re-

quired to report to the comptroller, within ten days after declaring any dividend, the amount of such dividend and the amount of net earnings in excess thereof, and "such report shall be attested by the oath of the president or cashier of the association." In the latter section the word "attest" is certainly used in the sense of certifying in the manner indicated, to the correctness of the report, and its use in that evident sense in such close juxtaposition to the language we are considering reinforces the conclusion that by the attestation is meant something more than the mere witnessing of the report. It is true that it has been frequently held in this court that in an action for false representations it is not necessary to aver or prove a *scienter*. (*Foley v. Holtry*, 43 Neb. 133; *Johnson v. Gulick*, 46 Neb. 817; *Moore v. Scott*, 47 Neb. 346.) But it does not follow that one making a statement is charged absolutely with the consequences of its falsity in fact regardless of the form of the statement and the circumstances under which it is made. Indeed, in the cases cited the language used in one, and implied in the others, is that one is liable for the consequences of the false statement only when it is made as a positive representation of an existing fact. In *Moore v. Scott*, the statement was qualified by the person's making the representation giving the source of his information as "a reliable person" and stating his belief on that ground, and it was held that he was not responsible thereby for the truth of the ultimate statement, but only for the truth of his receiving such information from a reliable person. We must therefore inquire whether Yates attested this report as a positive statement that the condition of the bank was as represented therein, or whether, on the other hand, the attestation was qualified. The majority of the court is of the opinion that it was positive. Commissioner RYAN and the writer think it was qualified. The question involves a consideration of the duties of directors in national banks, and as that question depends upon the construction of the national

banking act, the federal decisions on the point conclude us. The question was considered with great care in *Briggs v. Spaulding*, 141 U. S. 132, and while four justices there dissented on the ground that directors should be held to a higher degree of accountability than the majority opinion declares, we are bound to accept the opinion of the majority as controlling. The law there declared is substantially as follows: That the degree of care required of directors depends upon the subject to which it is to be applied, and each case is to be determined from all its circumstances; that directors are not insurers of the fidelity of the agents whom they appoint, nor can they be held responsible for the misconduct of such agents unless the loss resulting is a consequence of their own neglect of duty; that directors of a national bank must exercise ordinary care and prudence in the administration of the affairs of the bank, and this includes something more than officiating as figure-heads. They may commit the banking business to the officers, but this does not absolve them from the duty of reasonable supervision; nor should they be permitted to shield themselves from liability because of want of knowledge of wrong-doing, if that ignorance is the result of gross inattention. The remaining points decided in the case cited relate to the application of the particular facts of that case to the rules laid down. Following the case cited the circuit court for the northern district of New York has held that where the affairs of a bank were managed solely by the cashier, who was reputed and universally believed to be honest and capable, directors who knew little of the business of banking were not guilty of negligence because they failed to examine the books, there being no grounds of suspicion known to them. (*Warner v. Penoyer*, 82 Fed. Rep. 181.) This being the rule of duty imposed on national bank directors, we think it follows that when a director attests a report he does so as a director and with a view only to such knowledge of the condition of the bank as the exercise of his duties

as a director imposes upon him. The verification by the oath of one of the chief active officers of the bank has of course a more extended scope as a representation; but the director is not required to make a special examination for the purpose of attesting, and attests a report only as the result of such knowledge as the proper discharge of his duties as director imposes upon him; that is, reading into the report, as we must, the director's legal duty, the words on these reports, "correct, attest," mean, in effect, "we, as directors, certify to the correctness of the foregoing report, basing our certification on the knowledge which we possess by virtue of a proper discharge of our duties as directors."

It is not, therefore, an absolute certification of the correctness of the report, but is qualified by the limited means of knowledge which a director may lawfully possess. Looking into the evidence with regard to Yates, we find that he was actively engaged in other business requiring practically all his time; that he had never been engaged in the banking business; that he had never kept books of a bank, and in attesting the reports he relied upon the president, cashier, and employés for their correctness. They were brought to his office and he signed them, assuming, that they were correct. He was himself a depositor and lost money through the failure of the bank, and had the utmost confidence in the bank to the time it failed. The foregoing is from his own testimony. Examining this proof, together with the general testimony as to the manner in which the bank was managed, we think there was evidence sufficient to go to the jury to determine whether Yates' ignorance of the condition of the bank and the falsity of the reports was the result of that gross inattention which in *Briggs v. Spaulding* is held necessary to charge the director with a personal liability. It seems that he attended generally the meetings of the directors, but that he took no other steps to investigate the conduct of the business, reposing confidence and depending altogether on the supposed in-

tegrity of the officers of the bank. Whether under the circumstances he was justified in so doing, in assuming the reports to be correct and in attesting them, we think was fairly a question of fact under the rules laid down in *Briggs v. Spaulding*, and therefore it was error to peremptorily instruct the jury to find in his favor. The judgment as to him must be reversed. Affirmed as to Thompson, Phillips, Stuart, and Hamer. Reversed and remanded as to Mosher, Outcalt, and Yates.

JUDGMENT ACCORDINGLY.

NORVAL, J.

While we are all agreed as to the judgment that should be entered herein, the majority of the court do not concur in the proposition expressed by IRVINE, C., to whom was assigned the duty of preparing the opinion of the court, that the attestation of reports of a national bank to the comptroller of the currency by the directors thereof does not amount to an absolute representation that such report is true, just, and correct. The learned commissioner cites in support of the doctrine announced *Briggs v. Spaulding*, 141 U. S. 132. This case is not controlling upon the question before us, and is distinguishable from the case at bar. That was a suit by a receiver of a national bank against its directors to recover losses and damages sustained by the bank by reason of the alleged neglect of duty and wrongful conduct of the defendants, while the present action was not instituted for and in behalf of the Capital National Bank or by an individual creditor thereof, but by one who was induced to purchase stock of the bank in reliance upon the false report of the condition of resources and liabilities of the corporation made under oath of its president and cashier and attested by certain of its directors. That the result probably would have been different in *Briggs v. Spaulding*, *supra*, if that suit had been grounded as the present one, or had been brought by a creditor to recover loss occasioned by his having been induced to make deposits in

the bank through the false statements as to its financial condition made to the comptroller, is clearly inferable from the following excerpt from the majority opinion prepared by Chief Justice Fuller: "The theory of this bill is that the defendants are liable, not to stockholders nor to creditors, as such, but to the bank, for losses alleged to have occurred during their period of office, because of their inattention. If particular stockholders or creditors have a cause of action against the defendants individually, it is not sought to be proceeded on here, and the disposition of the questions arising thereon would depend upon different considerations. * * Treated as a cause of action in favor of the corporation, a liability of this kind should not lightly be imposed in the absence of any element of positive misfeasance and solely upon the ground of passive negligence; and it must be made to appear that the losses for which defendants are required to respond were the natural and necessary consequence of omission on their part." A bare majority of the court concurred in the decision in *Briggs v. Spaulding, supra,* four of the justices having dissented therefrom. The able dissenting opinion of Justice Harlan filed therein, in which Justices Gray, Brewer, and Brown concurred, held that the directors of a national bank could not abdicate their duties and functions, and leave the administration and managements of its affairs solely to executive officers, but that the law requires of directors "such diligence and supervision as the situation and the nature of the business requires. Their duty is to watch over and guard the interests committed to them. In fidelity to their oaths, and to the obligations they assume, they must do all that reasonably prudent and careful men ought to do for the protection of the interest of others intrusted to their charge." But if the rule of the majority in *Briggs v. Spaulding, supra,* as to the degree of diligence required of directors of national banks be accepted as sound, yet it is without controlling force in the present action. As to creditors of the corporations, and others not connected

with the bank, most certainly a higher degree of dili-
gence is required of the directors than obtains in a con-
troversy between them and the bank itself. In the case
to which reference has been made the wrecking of the
bank was not traceable to the false reports made by the
directors to the comptroller; hence the question whether
the bank directors are individually liable for any losses
occasioned by their having attested false statements as
to the condition of the corporation was not involved in
the case, or necessary to a decision.

The defendants in the present suit, who as directors
attested the reports made by the Capital National Bank
to the comptroller of the currency, by such act vouched
for, or certified to, the absolute truthfulness of the state-
ments therein contained, and not that the report was cor-
rect so far as the directors knew or had been advised by
the proper performance of their duties as directors. The
means of information, this record shows, were accessible
to them. It was their duty to know whether the reports
were correct or not. For them to have ascertained the
untruthfulness of the reports required no extended ex-
amination of the books of the bank or into the condi-
tion of its affairs. A mere comparison of any report
with the daily balance sheet of the bank for the same
date would have revealed the absolute falsity of such re-
port. It is no answer to say that they were not aware of
the insolvent condition of the bank. Section 5147 of the
Revised Statutes of the United States requires: "Each
director, when appointed or elected, shall take an oath
that he will, so far as the duty devolves upon him, dili-
gently and honestly administer the affairs of such asso-
ciation." The scope of the obligation assumed by the
director of a national bank is indicated by the oath he
is required to take. He is under obligation not only to
honestly, but diligently, administer the affairs of the cor-
poration in which he is a director. He may not sit
supinely by and permit the executive officers, which he
has helped to elect, to rob and plunder the bank, and then

excuse himself from individual liability by showing that he was unaware of the true condition of the bank or what was transpiring around him. The law demands and requires that he diligently administer the affairs of the association. In the language of Severens, J., in *Gibbons v. Anderson*, 80 Fed. Rep. 345: "The idea which seems to prevail in some quarters, that a director is chosen because he is a man of good standing and character, and on that account will give reputation to the bank, and that his only office is to delegate to some other person the management of its affairs, and rest on that until his suspicion is aroused, which generally does not happen until the mischief is done, cannot be accepted as sound. It is sometimes suggested, in effect, that, if larger responsibilities are devolved upon directors, few men would be willing to risk their character and means by taking such an office; but congress had some substantial purpose when, in addition to the provision for executive offices, it further provided for a board of directors to manage the bank and administer its affairs. The stockholders might elect a cashier, and a president as well. The banks themselves are prone to state, and hold out to the public, who compose their boards of directors. The idea is not to be tolerated that they serve as mere gilded ornaments of the institution, to enhance its attractiveness, or that their reputation should be used as a lure to customers. What the public suppose, and have the right to suppose, is that those men have been selected by reason of their high character for integrity, their sound judgment, and their capacity for conducting the affairs of the bank safely and securely. The public act on this presumption, and trust their property with the bank in the confidence that the directors will discharge a substantial duty. How long would any national bank have the confidence of depositors or other creditors if it were given out that these directors whose names so often stand at the head of its business cards and advertisements, and who are always used as make-weights in its

solicitations for business, would only select a cashier
and surrender the management to him? It is safe to
say such an institution would be shunned and could not
endure. It is inconsistent with the purpose and policy
of the banking act that its vital interests should be com-
mitted to one man, without oversight and control." (See
*Williams v. McKay*, 40 N. J. Eq. 179; *Martin v. Webb*, 110
U. S. 7.)

In our view, whether the attesting directors possessed
knowledge of the falsity of their reports is wholly imma-
terial. They were in fact false and untrue, and those
who deposited money with the bank or who purchased
stock of the corporation in reliance upon the truthfulness
of the contents of those reports were as much deceived
and damaged thereby as though the directors when they
signed the reports knew them to be false. That they
were innocent of the true situation or condition of the
affairs of the bank is wholly an unimportant considera-
tion, since proof of a *scienter* is not necessary to a re-
covery. This court has frequently asserted that to main-
tain an action for false representations it is not essential
that it be shown that they were intentionally or know-
ingly made by the defendant. This is the rule in ordinary
causes, and no valid reason can be suggested or pointed
out why the same principle should not apply in actions
for deceit against the directors of a banking corporation.
Certainly no case has come under our observation which
has made an exception in their favor.

In *Miller v. Howard*, 32 S. W. Rep. [Tenn.] 305, it was
disclosed that the directors of a national bank on its sus-
pension issued a circular stating that the bank was
solvent and would open within sixty days, and author-
ized the officers to receive money on special deposit and
keep it in the bank vaults subject only to the check of
the depositor. Subsequently a receiver for the bank was
appointed and the money deposited pursuant to said
circulars was turned over to him. It was held that the
directors were personally liable for the amount of such

deposits. Wilkes, J., in the course of his opinion, used this apposite language: "Directors are not mere figureheads, with no duties to perform, and with the liberty of leaving matters of this character to their president and cashier, and relieving themselves of liability and duty, by placing special funds they are under obligation to deliver to special depositors in the hands of third persons, and then leaving it to their depositors to litigate with such third persons over their claims and rights. * * * This is not a case of want of ordinary care on the part of the directors, but a case of positive, active, misconduct, which resulted in injury to complainant, and for which they are liable to him."

In *Cross v. Fish*, 65 L. T. Rep. n. s. [Eng.] 114, with the knowledge and consent of the directors of a building society, advertisements were issued by the secretary inviting the loaning of money to it. Money advanced to the society was paid to the secretary, who receipted therefor, but did not enter the proper amount on the books of the society, and by reason thereof the secretary was enabled to appropriate to his own use a large sum of money, and upon his absconding it was discovered that the sum borrowed by the society was in excess of the amount allowed by its rules. It was held, in an opinion by Mathew, J., that the directors were personally liable for the amounts borrowed by the society in excess of its borrowing powers.

*Merchants Nat. Bank of Hillsboro v. Thoms*, 28 W. L. B. [O.] 164, discloses the following state of facts: The executive officer of a national bank made reports to the comptroller of the currency, under oath, of the assets and liabilities of the corporation, and the same were attested by three of the directors. These reports were published according to law and disclosed the bank to be in a highly prosperous financial condition, while in fact the statements in said reports were almost entirely false and the bank at the time was almost insolvent. Relying upon the truth of the reports plaintiff loaned a stockholder of

the bank money and received as collateral security a number of shares in said bank, which would have been ample security had the reports been true, but in fact the stock when the loan was made was worthless. The borrower was insolvent and the loan was made solely on the credit of the stock so pledged and upon the value thereof as the same appeared from the said reports. Plaintiff brought an action for deceit against the attesting directors of the insolvent bank, and the court held they were individually liable for the damages sustained.

*Tate v. Bates*, 118 N. Car. 287, was an action by the state treasurer of North Carolina against the directors of an insolvent bank personally to recover for his loss of deposits. Tate claimed that he was induced to make the deposits, and permitted the same to remain in the bank, by false and misleading published statements sworn to by the president and cashier and verified by three directors showing that the bank was solvent, its capital unimpaired, and that it had a surplus on hand. The court, in the opinion, say: "The directors are conclusively presumed to know the condition of the bank. (*Hauser v. Tate*, 85 N. Car. 81, 39 Am. Rep. 689; Morse, Banks & Banking sec. 137; *Finn v. Brown*, 142 U. S. 56; *United Society of Shakers v. Underwood*, 9 Bush [Ky.] 609, 15 Am. Rep. 731; and other cases cited in *Solomon v. Bates*, 118 N. Car. 311.) If the directors did not know the bank was insolvent, it was their duty to have known it. It was fraudulent for them to put forth official statements that the bank was solvent, when they did not know it to be true, and they are liable to those who were deceived thereby, into having dealings with the bank, or making deposits therein, for any losses sustained. If this were not so, the directors of a bank would be privileged to be negligent, and the more ignorant they could manage to be about its condition the more secure they would be from any liability."

*Solomon v. Bates*, 118 N. Car. 311, was precisely like the preceding case. In the last case it was contended that

the petition did not state a cause of action for deceit, because it did not charge that the defendants intended to deceive the plaintiff.   The court, in the course of the opinion, said: "It is sufficient to allege that, the bank being insolvent, the defendants caused false and fraudulent statements of the condition of the bank to be published, representing it to be solvent and with capital stock unimpaired, and declaring dividends, all this with a view to conceal its insolvent condition and induce the public to make deposits, whereby the plaintiff was deceived and made one deposit which he is now seeking to recover.   Indeed, the directors are liable for injury caused by relying upon a statement issued by them which they did not know to be true, as well as when they knew it to be false.   (*Hubbard v. Weare*, 79 Ia. 678; *Huntington v. Attrill*, 118 N. Y. 365; 42 Hun [N. Y.] 459; 3 Thompson, Corporations, sec. 4244.)"

Notwithstanding this opinion has now reached an unusual length we cannot refrain from making the following quotation from the decision in *Seale v. Baker*, 70 Tex. 289: "Directors of banking corporations occupy one of the most important and responsible of all business relations to the general public.   By accepting the position and holding themselves out to the public as such they assume that they will supervise and give direction to the affairs of the corporation, and impliedly contract with those who deal with it that its affairs shall be conducted with prudence and good faith.   They have important duties to perform towards its creditors, customers, and stockholders, all of whom have the right to expect that these duties will be performed with diligence and fidelity, and that the capital of the corporation will thus be protected against misappropriation and diversion from the legitimate purposes of the corporation.   *   *   * It is the duty of the directors to know the condition of the corporation whose affairs they voluntarily assume to control, and they are presumed to know that which is their duty to know and which they have the means of knowing.

If the representations are false, but relied and acted on by a customer to his damage, to hold that in such case the directors who made such false representations are not liable because they were ignorant of the falsity of such representations, would be to award a premium for negligence in the performance of important and almost sacred duties voluntarily assumed, and to license fraud and deception of the most flagrant and pernicious character. It is a familiar principle of the law that an action for damages lies against a party for making false and fraudulent representations, whereby another is induced to do an act from which he sustains damage. If the representations are untrue, it is immaterial that they may have been made without fraudulent intent, and it is sufficient that they were made to the general public, if the appellant was induced thereby to deposit money in the bank."

The following authorities to some extent sustain the doctrine that a director of a bank is liable for damages resulting from permitting a statement to be held out to the public that the institution was solvent, even though the director was unaware that such report was false: *Delano v. Case*, 121 Ill. 247; *Kinkler v. Junica*, 84 Tex. 119; *German Savings Bank v. Wulfekuhler*, 19 Kan. 60; *Salmon v. Richardson*, 30 Conn. 360; *Morse v. Switz*, 19 How. Pr. [N. Y.] 275. Upon principle and authority the conclusion is irresistible that directors cannot escape liability for damages resulting from false statements made by them of the conditions of the bank, even though they were at the time ignorant that such statements were false. The judgment as to Thompson, Stuart, Phillips, and Hamer should be affirmed, and reversed as to Mosher, Outcalt, and Yates.

HARRISON, C. J., SULLIVAN, J, and RAGAN, C., concur in the foregoing opinion of NORVAL, J.